## SOUTH TEXAS NATURAL GAS GATHERING COMPANY, Appellant,

v.

## David GUERRA et al., Appellees.

### No. 566.

Court of Civil Appeals of Texas.
Corpus Christi.

June 22, 1971.

Rehearing Denied July 29, 1971.

Kleberg, Mobley, Lockett & Weil, Leslie S. Lockett, Corpus Christi, William E. York, McAllen, for appellant.

Atlas, Hall, Schwarz, Mills, Gurwitz & Bland, Asa V. Bland, Jr., McAllen, Branscomb, Gary, Thomasson & Hall, Richard Hall, Corpus Christi, for appellees.

## OPINION

SHARPE, Justice.

This is a personal injury suit instituted by David Guerra, one of the appellees here, originally against Coastal States Gas Producing Company, for damages resulting from injuries received by him on October 1, 1968 in Hidalgo County, Texas, when a bulldozer struck and ruptured an underground gas transmission line near the place where Guerra was working. Because the pipeline was not owned by Coastal States, but rather by one of its wholly owned sub-

sidiaries, South Texas Natural Gas Gathering Company, a corporation, the latter was substituted as a defendant, and is the appellant here. It will sometimes hereafter be referred to as "Gas Company". Thereafter, appellant filed a third party action against Gregorio Godinez, the operator of the bulldozer and his employer N. H. Roane, Inc., and also against N. H. Roane, individually, and South Texas Cattle Management Corporation, sometimes hereafter referred to as "Cattle Company", the employer of David Guerra and the operator of the ranch where the accident happened. In turn, the Cattle Company and Roane, Inc., cross-acted against Gas Company for damages sustained in the accident to a Ford pick-up truck belonging to Cattle Company and to the bulldozer belonging to Roane, Inc.

After jury trial the lower court rendered judgment against appellant Gas Company as follows: (1) In favor of David Guerra for $60,470.90; (2) in favor of Cattle Company for $1,200.00; (3) in favor of N. H. Roane, Contractor, Inc., for $5,260.95; (4) that Gas Company take nothing by reason of its third party action against N. H. Roane, Contractor, Inc., N. H. Roane, individually, South Texas Cattle Management Corporation and Gregorio Godinez. We affirm.

The accident occurred on the Arrowhead Ranch, owned by Mr. Lloyd M. Bentsen, Sr., located approximately 10 miles northwest of Mission, Texas. The rupture or explosion was caused when a bulldozer owned by N. H. Roane, Contractor, Inc. came in contact with a 20 inch high pressure gas transmission line owned by appellant. The ranch was operated by South Texas Cattle Management Corporation, of which Mr. Howard Lohmann is manager. Appellee David Guerra was an employee of Cattle Company and at the time of the accident was digging post holes near the main gathering pens of the ranch and adjacent to the location of an old stock tank which was being excavated by Roane, Inc. The latter had been hired by Cattle Com-

pany to do such work. It appears that at one time Mr. Bentsen and Mr. Lohmann were named third party defendants by Gas Company, but were dropped as such prior to trial of the case.

The Arrowhead Ranch as Mr. Bentsen purchased it had contained about 27,000 acres, and at the time of trial he (or a family owned Corporation) still owned about 10,000 acres of it. At the time of the accident, the ranch was about eight miles long in an east-west direction and about two miles wide in a north-south direction. Approximately half way between the northern and southern boundaries of the ranch there is a caliche road which runs generally east-west. The accident in question occurred a few hundred feet south of that road at which point appellant's pipeline runs almost north-south. Appellant's pipeline crosses the caliche road at a point which is about two miles west of the gate at the east side of the ranch. The ranch extends about one mile north and the same distance south of the scene of the accident. The road is a 30 foot all weather caliche road, is the main road of the ranch and is used by farmers in the area and by the vehicles of Coastal States and other oil companies who have installations in the vicinity. There was testimony, principally by appellant's witnesses, that appellant, for a period of time had maintained a vent pipe and warning sign adjacent to the caliche road and north of the cattle pens in question, but the jury found, among other things, that the pipe and warning sign were missing prior to the accident here involved.

The trial court submitted 57 special issues to the jury. Some of them were conditionally submitted and not answered. The judgment contains the following recitation:

"And the court, having considered the verdict of the jury in which the jury found that various acts and omissions on the part of South Texas Natural Gas Gathering Company constituted negligence and a proximate cause of the accident made the basis of this suit, that the use of the premises upon which the acci-

dent in question occurred in excavation of water tanks was not an extraordinary use of the premises, that the accident in question was not unavoidable, and in which the jury failed to find that any negligence alleged on the part of N. H. Roane, Contractor, Inc. or South Texas Cattle Management Corporation was a proximate cause of the accident in question and having further found the amount of damages sustained by the various parties is of the opinion and finds that David Guerra, N. H. Roane, Contractor, Inc. and South Texas Cattle Management Corporation are entitled to recover judgment against South Texas Natural Gas Gathering Company and that South Texas Natural Gas Gathering Company should have and take nothing against N. H. Roane, Contractor, Inc., N. H. Roane, Individually, South Texas Cattle Management Corporation and Gregorio Godinez by reason of its third party action against them. * * *"

The five grounds of liability found by the jury against appellant may be summarized as follows: I. That after the installation of the gas line, but prior to the accident in question, the vent pipe and warning sign adjacent to the road and north of the pens in question were missing (Issue 1); that the vent pipe and sign were missing for a sufficient length of time that the Gas Company knew or, in the exercise of ordinary care, should have known they were missing (Issue 2); that prior to the accident in question the Gas Company failed to replace the vent pipe and warning sign (Issue 3); that such failure to replace the vent pipe and warning sign constituted negligence on the part of the Gas Company (Issue 4); that such negligence was a proximate cause of the accident in question (Issue 5). II. That the Gas Company did not at any time mark the pipeline in question where it crosses the east-west road in question by painting the fence on the south side of the road (Issue 6); that such failure to mark the fence was negligence (Issue 7); that such negligence was a proximate cause of the accident (Issue 8). III. That the Gas Company knew prior to the accident in question that a bulldozer was digging tanks on the ranch (Issue 10); that the Gas Company failed to inform Cattle Company or N. H. Roane, Contractor, Inc., of the existence of the gas line in question (Issue 11); that such failure to inform constituted negligence on the part of the Gas Company (Issue 12); that such negligence was a proximate cause of the accident (Issue 13). IV. That before the accident the Gas Company failed to make such inspection of its pipeline as a person of ordinary prudence would have made under the same or similar circumstances (Issue 41); that such failure to make such inspection was a proximate cause of the accident (Issue 42). V. That before the accident the Gas Company failed to install or maintain such markers on the Arrowhead Ranch as a person of ordinary prudence would have done to indicate to persons working on the ranch the location of the high pressure gas line (Issue 43); that such failure to install or maintain such markers was negligence (Issue 44); and a proximate cause of the accident (Issue 45).

Appellant asserts 34 points of error. Its first two points read as follows:

"POINT OF ERROR NO. 1

"As a matter of law, the use being made of the land at the time the accident happened was an extraordinary use of the surface of the land. The evidence did not show that defendant (appellant) had notice thereof. Therefore appellant, the owner of the dominant estate in the land, had no duty to give notice of the location or presence of its pipeline, and the court erred in entering judgment against appellant and in favor of appellees because of the jury's finding of failure to give such notice."

POINT OF ERROR NO. 2

"The Court erred in entering judgment for appellees and against appellant bas-

ed in whole or in part on the jury's answer to Special Issue No. 9 (that excavating the cattle tank by a bulldozer was not an extraordinary use of the land), because such answer (a) had no evidence to support it, and alternatively (b) had insufficient evidence to support it, and alternatively (c) was against the overwhelming weight and preponderance of the evidence."

Special Issue No. 9 and the jury answer thereto are as follows:

"Do you find from a preponderance of the evidence that the excavation of the cattle tank in question by the bulldozer in question at the location where the explosion occurred was not an extraordinary use of the surface of the land?

"In connection with the above Special Issue, you are instructed that 'an extraordinary use' means a use that is beyond or out of the common order or method, a use that is not usual, customary, regular or ordinary.

"You will answer, 'It wasn't an extraordinary use' or 'It was an extraordinary use'.

"We, the Jury, answer *It wasn't an extraordinary use*"

Counterpoint one of appellee David Guerra is as follows:

"The trial court properly rendered judgment for appellee for the reason that the digging of a stock tank next to a windmill on the ranch in question was not an extraordinary use of the surface of the ranch and the appellant breached its duty to exercise ordinary care in maintaining markers of the gas line to let ranch workers know of its existence all as found by the jury. (A) The accident or event was such that appellant should have anticipated that it or a similar one would occur if their line was not marked like other pipe lines in the area. (B) Appellee was in the geographical zone of danger. (C) Appellee was in the class of persons who

Appellant should anticipate would be harmed by their breach of duty."

The record reflects that years prior to the accident, Mr. Lloyd M. Bentsen, Sr., had sold the Arrowhead Ranch to the Lee family. In 1959 C. A. Lee and wife, Dale Lee, granted a pipeline easement to appellant which was duly recorded. In 1966 Mr. Bentsen reacquired the Arrowhead Ranch. His deed recited that it was subject to easements of record. Shortly thereafter, he began an extensive brush clearing operation which lasted until the early part of 1968. The work was done by Roane, Inc. Mr. Bentsen testified that he had no actual knowledge of the existence of appellant's gas transmission line on the Arrowhead Ranch or of warning signs or markers in connection therewith. Mr. Lohmann, the manager of Cattle Company, testified to the same effect, and further said it was impossible to see a distance of one mile in any direction from the point of the accident because of the rolling nature of the country and buffle grass growing in the area. The testimony of David Guerra, Gregorio Godinez, and N. H. Roane also was to the effect that they did not have knowledge of the existence of appellant's pipeline where the accident occurred or in the immediate vicinity thereof or of warning signs or markers in connection therewith.

Prior to the accident, five stock tanks had been dug within an area of approximately one mile of where the sixth one was to be reexcavated. The latter stock tank, where the bulldozer struck the gas transmission line, was near a windmill and adjacent to the main working pens of the ranch. The pens were used whenever cattle were worked, sprayed or vaccinated or calves sold. Mr. Lohmann testified that stock tanks are frequently adjacent to windmills in the area. Mr. Lloyd Bentsen, Sr. testified that the digging of a water tank in the area is not an unusual use of the land; that it is done on all the ranches; and that he has at least 25 stock tanks on his ranches.

The evidence shows that there is a gas line of Rio Grande Valley Gas Company crossing the caliche road about two miles west of the scene of the accident which is marked on both sides of the road by signs which state "Danger High Pressure Gas Line" and is also marked by colored fence posts. There is another high pressure gas line of Tennessee Gas Company which crosses the ranch (south of the above-mentioned road) and the road immediately east of the ranch just before arriving at its main gate that is also marked by a sign. The Tennessee Gas line is also marked by a colored post where it crosses a fence line a short distance south of the caliche road, near where a stock tank and windmill are located.

A number of witnesses who were employees of appellant or of Coastal States testified on the trial of the case. Mr. Gary Harris, District Construction Maintenance Foreman for Coastal States, testified in part substantially as follows: The "as-built" maps of Coastal States reflect that a warning sign and vent pipe installation was called for at a location just north of the caliche road near to where the accident occurred. He said that on his last visit by the place of the accident, some sixty days before it occurred, there was a two-inch pipe with a 180° turn in it and a sign on it which read: "Danger High Pressure Gas Line" located on the north side of the caliche road and facing it near where the accident occurred. This was a replaced sign, the first one having been knocked down and replaced in about 1963. After the accident occurred on October 1, 1968, he went out to the scene thereof. At that time the above-surface portion of the pipe was gone. It was broken some 7 or 8 inches below the surface. He had previously been on the road some 4 or 5 times and had observed the sign every time. Mr. Harris further testified that there was nothing to indicate the existence of appellant's line where it crossed the caliche road near the scene of the accident except the aerial markers which were 3 miles in one direction and 2 miles in the other from that point and a cathodic test lead located approximately one mile south thereof. The cathodic test pipe is a post with a piece of conduit on the back of it, about 2 to 3 feet high.

Mr. Earl Batey testified in part substantially as follows: He works as area foreman for South Texas Natural Gas Gathering Company and also Coastal States Producing Company. They are one and the same as far as he knows. The witness was asked if he could think of anyone not with his company who would have been able to look at the land out there and say "There is a South Texas high pressure gas line through this particular section" and replied that "I don't believe that I know of anyone." He later said that some of the people with Rio Grande Valley Gas Company or Tennessee Gas Transmission would probably know about appellant's line because it crosses their line or lines and they probably had some men out there who spotted their lines where appellant's line runs over or under theirs. Mr. Batey further testified that a standard or accepted procedure in the gas industry was to paint a fence post in the fence line adjacent to a road where the gas line crosses it with a color that symbolizes the company, in this case, a two-tone green. There were no fence posts so painted or colored in the fence line adjacent to where the accident in question occurred. Mr. Batey also testified that there was no way (short of being in an airplane) that a person could line up the aerial marker located three miles north of the accident scene with the aerial marker two miles south thereof and figure where the gas line in question was running. A person working near the scene of the accident could not see the cathodic test lead from that location. He further said that all the personnel working under him were instructed to report any heavy equipment working in the areas of the lines and he didn't know of any Coastal personnel who are not under such instructions in the area involved in this suit.

Mr. Ewald Fisher testified in substance as follows: He is an employee of Coastal States Gas Producing Company. At the time of trial, in October 1969, he resided in Portland, Texas. For some time prior to about February 1967 he lived in McAllen, Texas and served as area foreman for Coastal States, which position was later held by Mr. Gary Harris. Fisher was in Corpus Christi on October 1, 1968, at the time of the accident in question. He was in McAllen at the time the Coastal Line was built and on occasions would go to the ranch and section of the line here involved. In 1962 there was a rupture of the line about 100 yards north of the caliche road near the scene of the later 1968 accident. Fisher said he had seen a vent pipe and Coastal States sign on the north side of that road as late as about the latter part of 1966. There was a two-inch steel vent pipe with a 180 degree turn at its top with a sign on it. His company had installations in the area which he periodically inspected and he made the tour with the gauger, who would use the caliche road in going to a small lateral leading off the line in question. Fisher also testified that his department under its instructions would have reported a missing vent or sign. He thought it was important to repair, maintain or replace those things at the places where they were supposed to be, basically on highways and main thoroughfares. The reasons given by him were company image, to mark the pipeline for the pipeline patrol and "for anyone else that might want to know it is there." He agreed with other testimony that the warning sign originally installed near the road and scene of the accident "was put there to warn people not with Coastal States that there is a high pressure gas line in this area". However, he also said he didn't think it important to maintain the sign there at a later time because there had been a change in the usage of the road, and that there was no more constant traffic after the gates were locked on the east and west sides thereof.

Mr. Perry Kerr, who was also an area foreman for appellant, testified in substance as follows: He lives in Falfurrias, Texas, and had worked for appellant about seven and a half years. The area in which the pipeline in question is located came under his jurisdiction in about February 1967. He said if he had known the particular vent pipe or sign were both missing, he would have endeavored to replace the same; that the vent pipe and sign served a useful function in protecting the road had there been a leak and would prevent cars from catching the line of fire or burning; and would advise that there was a high pressure gas line in the area, he supposed.

In his first amended petition, Guerra alleged that the Gas Company operated a 20 inch pipeline across the Arrowhead Ranch and that it was negligent in failing to mark the high-pressure line, to replace warning signs and in not informing the owner and operators of the ranch of the existence and location of the line. In response, the Gas Company alleged that the public in general was charged with notice that the Gas Company had a right-of-way agreement which "specified in detail the path or route such pipeline was authorized to cross the said Arrowhead Ranch as being a five-foot easement adjacent to the west side of certain county road." The right-of-way agreement was received in evidence as Exhibit D–33 and was and is relied upon by Gas Company as a part of its defense to the claims asserted against it in this suit. However, the evidence reflected that the Gas Company pipeline was not on the described right-of-way at some locations. No issue was submitted to the jury nor was one requested as to whether the pipeline was in fact within the easement granted. The right-of-way agreement itself (Defendant's Exhibit 33) provided for a 5-foot right-of-way beginning at a point north of the north boundary line of the present ranch and running south in a straight line, 9 degrees 34 minutes west, a distance of 22,153 feet. According to the Gas Com-

pany's surveyor and witness, Mr. Buford Crawford, the easement should have run in a straight line between the letters "O" and "Q" on Plaintiff's Exhibit 6, the latter point being a considerable distance south of the location of the accident and the place where appellant's line crossed the caliche road. But appellant's own evidence showed that its line did not so run. The "as-built" map of the pipeline prepared by Gas Company or Coastal States reflected that at a point about 1550 feet north of the place where the accident occurred, the pipeline was running 9 degrees 34 minutes east and that it suddenly changed directions to go 25 degrees 26 minutes west, a 35 degree difference in direction. Crawford testified that after the accident no one asked him to run a complete survey to see where the easement in fact ran. He further said that the 35-degree deviation amounted to a 30-foot lateral offset of the pipeline; that according to Gas Company records it only had a 5-foot easement; and that the *pipeline could therefore not possibly be within the 5-foot easement on both sides of the jog.* He didn't know which end of the line would have been 30 feet off of the easement but he agreed that one end was apparently 30 feet off. This deviation was within about 1240 feet of the caliche road near to where the accident occurred. Crawford agreed that according to the Gas Company's strip map, its pipeline was not along the route described in the right-of-way easement and was not parallel to the easement which he said was "very poor management". Crawford's examination of the location of the pipeline was made after the accident. According to Crawford, there was a strip of disturbed earth at the site of the blowout about 50 feet wide. Crawford had prepared an independent survey of only the immediate blowout area which was marked as Defendant's Exhibit 36. Although on direct examination he had agreed with appellant's attorney that the replaced pipeline was in the easement, he conceded that he was unable to tell where the pipeline was

with respect to the easement before the accident. He also said that at one end of his survey, as represented by Defendant's Exhibit 36, the pipeline took off on a call of 9 degrees, 25 minutes, which was not what was specified in the easement, and on a call of 9 degrees, 30 minutes at the other end, which was also not what was called for in the easement agreement.

Appellant's brief asserts in part: "Without objection, the right-of-way agreement (Exhibit D–33) was received in evidence. This gave appellant the right to lay the pipeline across the Arrowhead Ranch." That assertion is not completely accurate in that it does not go far enough. The right-of-way agreement gave the right to lay the pipeline across the Arrowhead Ranch *within the easement specified.* Whether the pipeline was on or off of its easement was calculated to have a material effect on the jury's determination of the propriety of the conduct of the various parties. For example, the jury might well have reached different conclusions as to the Gas Company's negligence vel non in failing to paint a fence post or maintain a warning sign depending on whether the pipeline was actually within or out of the right-of-way granted.

Appellant's argument under its point one is largely based upon the holdings in Phillips Pipe Line Company v. Razo, 420 S.W.2d 691 (Tex.Sup.1967). In that case the plaintiff Razo was injured when a bulldozer operated by his employers hit and ruptured a buried pipeline operated by the defendant Phillips, causing an explosion and fire. The trial court rendered judgment for Razo based on jury findings. The Court of Civil Appeals ordered a remittitur and affirmed. The Supreme Court reversed and rendered judgment that Razo take nothing. Among other things, the Supreme Court in *Razo* pointed out that the easement was located on land which "was heavily wooded and marshy river bottom land in a remote rural area which was used only for grazing a few head of cattle" and that "the evi-

dence indicates that the road was passable by a pickup truck only in dry weather, and it was used only infrequently by the owner for that reason. The accident occurred in January of 1962. The road was impassable during all of 1960, and used only a few times in 1961, the year preceding the explosion." Further that "The explosion occurred when the bulldozer— became stuck in the mud and struck the high pressure pipeline during the efforts to free the bulldozer" and that "The evidence indicates that the equipment left ruts from 12 to 48 inches deep over the Phillips pipeline." The jury in *Razo* found that the movement of the dragline and bulldozer down Phillips' right-of-way was not an extraordinary use of the surface. The Supreme Court held that there was no evidence to support such a finding and that "The movement of a 50,000-pound dragline and a 40,000-pound bulldozer over a small, private and rarely used road or trail in heavily wooded and muddy terrain is an extraordinary use as a matter of law."

In *Razo* the Supreme Court cited and discussed its prior decision in Pioneer Natural Gas Co. v. K & M Paving Co., 374 S.W.2d 214 (Tex.Sup.1963). Both *Razo* and *Pioneer* involved holdings by the Supreme Court that as a matter of law the accidents in question resulted from an extraordinary use of the surface, and did not fall within those cases involving an ordinary use of the surface.

We do not believe that there is any proper analogy between *Pioneer* and the instant case. There it was held in substance that K & M Paving Company as a matter of law was charged with a duty of inquiring before excavating in a city street. The Court in part said:

"In the construction and maintenance of the pipeline, Pioneer has a duty of ordinary care to protect people and property in the vicinity of the line from the types of harm ordinarily resulting from a gas pipeline. Thus they have a duty to properly install their lines and to avoid dangers from occurrences such as leaks and breaks in the pipe which could result from others making ordinary use of the surface. There may be other circumstances, not present here, in which additional duties or immunities have been imposed upon or granted to the pipeline operator by contract, oil and gas lease, statute,[1] administrative regulation, or ordinance.

\* \* \* \* \* \*

"We think it sound, in the light of the cases hereinafter discussed, to hold that at least where the activity is in an urban street or road, and where an unusual or extraordinary use of the surface is necessary to unearth the pipeline, and where there is no contract, statute, ordinance, or regulation governing the matter, the initial burden is upon the one who excavates or digs up the surface to avoid striking the line or to make reasonable inquiry as to the location of any lines which might be encountered. The duty of the pipeline operator under these circumstances arises, then, when it is requested to alter its lines or their use, when it is asked for information, or when it is otherwise put on such notice that it is required to take particular action to protect the lives or property of others."

It also appears that the cases relied on by the Court in *Pioneer* involved transmission lines of various kinds under city streets. The holdings therein appear to be based on the proposition that a person knows, or should know, that excavating in a city street is potentially dangerous.

We do not believe that either *Pioneer* or *Razo* are controlling in this case. We are not here dealing with excavation of city streets as was involved in *Pioneer*. Also, the facts in the instant case, although involving a rural area, are considerably different from those in *Razo*. Here the evidence tends to show that the road in question is an all-weather caliche road and is the main and only east-west road that runs through the ranch in question. It is fre-

quently used by the farmers in the vicinity as well as oil companies who have business in the area. The road is immediately adjacent to the main gathering pens on the ranch where there is much activity. Appellant conceded that for a time it had marked its pipeline near where it crossed the main road. The scene of the accident was near the place where appellant claimed it had marked its pipeline and near to the main pens of the ranch and a windmill which was used to supply water to the old stock tank which was being excavated.

In 30 A.L.R.3rd 670 there appears an annotation titled "Liability of one maintaining pipeline for transportation of gas or other dangerous substances for injury or property damage sustained by one using surface." The annotation in part sets out the following:

"Although a few courts have indicated that the operator of a pipeline used for the cross-country transportation of gas, oil or other dangerous substances can, in certain fact situations, be held liable for injuries or property damage on a theory of nuisance,[2] or breach of a covenant in the pipeline easement,[3] or liability without fault,[4] in most cases the courts have held that the injured person must prove that the pipeline operator was negligent in the operation and maintenance of the pipeline.[5]

"In the absence of a standard of care established by statute or regulation, the courts have said that a pipeline owner or operator is under a duty to exercise that degree of care which a prudent man would exercise under all the circumstances, or care which is commensurate with the dangerous character of the pipeline and necessary to protect the public from foreseeable injury therefrom.[6] An analysis of the cases shows that the duty and standard of care that a pipeline operator owes to a person on the surface of a pipeline right of way varies according to the status of the parties and the use of the property. * * * "

* * * * * *

"Where a gas pipeline is laid near or under a public highway, the pipeline owner is under a duty to bury it and mark its location so that it will not interfere with highway traffic and other legitimate uses of the highway right of way. This means, for example, that the pipeline company is expected to foresee that the highway will be used for movement of heavy machinery,[18] and that ditches along the highway right of way may be graded from time to time with bulldozers or other construction equipment.[19] The exercise of ordinary care in these situations means, therefore, that the pipeline company must mark the location of its pipeline in such a manner that persons using the highway right of way can, through the exercise of reasonable care, locate the pipeline. And if a pipeline company has actual knowledge that men are working in the area of the pipeline, the pipeline company is under a duty to warn the workmen about the location of its pipeline if it is not otherwise adequately marked.[20]

* * * * * *

"In a number of cases the liability of a pipeline owner for personal injuries, wrongful death, or property damage resulting from the alleged negligence in construction, maintenance, or operation of a pipeline used for the transportation of gas, oil, or other dangerous substances has turned on the issue whether the pipeline owner was under a duty to mark or otherwise disclose the location of the pipeline for the person injured. Whether there is a duty to give effective warning of the presence and location of the pipeline seems to depend upon whether, under all the facts, the pipeline owner or operator should have anticipated that the proper use of the surface by others entitled to make such use would be likely to bring the user into dangerous contact with the pipeline if he was not warned of its presence. Such a situation and a resulting duty to warn have been found in a number of cases."

We have concluded that, under all the evidence in this case, the question of whether the use being made of the land at the time the accident happened was an extraordinary use (as that term was defined by the court) of the surface of the land was for the determination of the jury. Otherwise stated, that issue was not established in appellant's favor (that the use was an extraordinary one) as a matter of law. Under the evidence herein, the issue was presented as to whether appellant should have anticipated that the proper use of the surface by others entitled to make such use would be likely to bring the user into dangerous contact with the pipeline if he was not warned of its presence.

The jury was authorized to believe that water or stock tanks are necessary and usual on cattle ranches and that excavation or reexcavation of the stock tank here in question under the circumstances was an ordinary, usual and customary use of the surface. The jury could properly consider the proximity of the tank being reexcavated to a windmill and the main gathering pens of the ranch and to the main east-west caliche road along with the amount of activity and traffic in that area. The jury could have believed that it was reasonable to assume that the main pens, the adjacent road and the immediate area might be used by heavy equipment and that ordinary and proper use of the surface in the area of the accident here involved might bring the user into dangerous contact with the pipeline if proper warnings were not given. The jury could also have given weight to the fact that, at a comparatively short distance from the scene of the accident, appellant's pipeline did not run in a straight line as called for by the easement and believed that ordinary care would require markers or warning signs to enable persons working in the area to locate the underground line.

We agree with appellees that the event in question was such that appellant should have anticipated that it or a similar one would occur if its line was not marked like other pipelines in the area. The fact that appellant had for a time marked the line near where it crossed the main road near the scene of the accident, and some of its own agents testified that similar locations were customarily marked and that the pipe and sign at said location would have been replaced had appellant's agents known they were missing, all tend to show what a reasonably prudent pipeline operator would have done in the exercise of ordinary care under the same or similar circumstances.

█ We cannot say as a matter of law that the use of the surface for excavating the stock tank here involved was an extraordinary use thereof. The evidence is legally and factually sufficient to support the jury finding on special issue number 9 that the excavation of the cattle tank in question by the bulldozer in question at the location where the explosion occurred was not an extraordinary use of the surface of the land.

Appellant's points 1 and 2 are overruled.

Appellant's point 3 asserts in substance that the trial court erred in allowing the witness Wied to testify to the effect that several days prior to the accident in question at a place more than a mile from it he saw and talked to a person who was driving a pickup truck with a sign "Coastal States" on the door, who said he was employed by Coastal States and to Wied's conversation with the driver. Appellant's point 4 asserts that the court erred in entering judgment based on the jury's answer to special issue 10 (that the Gas Co. prior to the accident knew a bulldozer was digging tanks on the ranch) because the evidence was legally and factually insufficient to support that answer. By his counterpoint 2 appellee Guerra replies to appellant's points 3 and 4, contending in substance that the testimony of Mr. Herbert Wied was properly admitted and that judgment was properly rendered for Guerra based on the jury answer to special issue 10. The deposition testimony of Mr. Wied was first offered by appellee Guerra and admitted without objection from appellant. Wied was later called to testify in

person by appellant but his testimony at that time related to an alleged telephone conversation with Mr. Wm. W. Hensley, an attorney for Coastal States in Corpus Christi.

The deposition testimony of Mr. Wied was in substance that three or four days prior to the accident at a location about two miles roughly south or southeast from the place of the accident in question he observed a bulldozer operator digging another tank. Wied watched the bulldozer work for a while and then drove on. Someone driving a vehicle on the other or north side of the fence waved for Wied to stop. The vehicle had a circular sign of some sort on the door that said Coastal States. Wied said he stopped and had a conversation with the driver of the vehicle with the Coastal States sign on it near a painted post in the fence. Wied testified that the other man (with whom Wied was not acquainted) said he was with Coastal States and that Wied noticed Coastal States painted on the door of the other vehicle. The other man asked Wied how to get on the opposite or south side of the fence and Wied told him where he could get through to that side. Wied also testified that the other man asked him if he "knew whether the dozer operator knew there was a gas line near by" and Wied answered in the negative. The other man then asked if Wied thought it was a good idea to tell the operator and Wied said he thought it was.

Several witnesses who were employees of appellant or of Coastal States testified concerning the possibility of a Coastal States employee and vehicle being at the location testified to by Wied. Mr. Batey, hereinabove mentioned, testified in substance that Coastal did not lend its cars out to other people and if someone was in the area of the Arrowhead Ranch in a car marked Coastal States it was likely he was a Coastal States employee and on Coastal States business. Batey also said all personnel working under him were instructed to report heavy equipment working in those areas, and he didn't know of any Coastal personnel who were not under the same

instructions. Mr. Perry Kerr, also hereinabove mentioned, testified that as far as he knew a man in the vicinity of the Arrowhead Ranch in a Coastal States' car would be on company business. Appellant offered in evidence a photograph of the sign or decal used on Coastal States Gas Producing Company vehicles. The sign is not a perfect circle but is oval or broadly elliptical in shape and contains the words "Coastal States Gas Producing Co." The words "Coastal States" appear on the top half of the sign and words "Gas Producing Co." on the bottom half thereof.

■ Under all the conditions and circumstances shown by the record herein, we believe that the contentions made by appellant under its points 2 and 3 are without merit. The testimony of Wied as to the Coastal States' sign on the pickup driven by the man who said he worked for Coastal States and who expressed concern with respect to the bulldozer working near a buried gas transmission line was properly admitted by the trial court. The "branded vehicle" doctrine is recognized by appellant. See Globe Laundry v. McLean, 19 S.W.2d 94 (Tex.Civ.App., Beaumont 1929, n. w. h.) and the many cases following it as shown in Shepard's South Western Reporter Citator. See also Kirk v. Harrington, 255 S.W.2d 557 (Tex.Civ. App., Fort Worth 1953, n. w. h.). Contrary to appellant's contention, we believe the branded vehicle rule is applicable here. As to admissibility of the declarations and conversation of the driver of the pickup marked with the Coastal States sign as testified to by the witness Wied, see McAfee v. Travis Gas Corporation, 137 Tex. 314, 153 S.W.2d 442 (1941). Appellant's points 3 and 4 are overruled.

Appellant by its points 5–9 attacks separately each of the five grounds of liability (hereinabove summarized) established by the jury findings against appellant. Appellant's point 5 is directed to the jury findings on special issues 4 and 5 (that the failure of Gas Company to replace a missing vent pipe and sign was negligence and a proximate cause of the accident), part

of the findings to support what we have designated hereinabove as ground of liability Number I. Appellant's point 6 complains of the jury findings on special issues 6, 7 and 8 (that the Gas Company did not mark the pipeline where it crossed the road by painting the fence on the south side of the road which was negligence and a proximate cause) which constitute the findings to support ground of liability Number II. Appellant's point 7 complains of the findings on special issues 11, 12 and 13 (that the Gas Company failed to inform Cattle Company or Roane, Inc. of the existence of the pipeline, part of the findings to support ground of liability Number III). Appellant's point 8 complains of the findings on special issues 43, 44 and 45 (that the Gas Company failed to install or maintain markers on the ranch to indicate to persons working on the ranch the location of the pipeline, which constitute the findings to support ground of liability Number V). Appellant's point 9 complains of special issues 41 and 42 (that before the accident Gas Company failed to properly inspect its pipeline as a person of ordinary prudence would have done and that such failure was a proximate cause of the accident, which constitute the findings to support ground of liability Number IV).

■ Appellant's basic contention under its points 5–9 is that the trial court erred in rendering judgment for appellees against appellant based upon the jury answers to the special issues mentioned (which are involved in grounds of liability I–V inclusive) because as a matter of law there was no duty to have or replace a vent pipe or warning sign or to paint the fence or to install or maintain on the ranch markers to indicate to persons working on the ranch the location of the pipeline and that the evidence was legally and factually insufficient to support the jury answers mentioned (and particularly concerning issues 41 and 42 that such insufficiency exists because inspection would not have disclosed excavation was being conducted) and to establish that such acts or omissions were negligence and a proximate cause

of the accident. We believe that the discussion herein under appellant's points 1 and 2 largely covers the contentions made under its points 5–9. We have held against appellant's contention that as a matter of law it had no duty to give notice of the location or presence of its pipeline. The jury findings now under consideration establish that appellant was negligent in the respects inquired about and that such negligence proximately caused the accident in question. The evidence is legally and factually sufficient to support the jury findings involved in appellant's points 5–9, and they are overruled.

Appellant's point 10 asserts error because the trial court allowed six peremptory jury strikes to the plaintiff Guerra and the same number collectively to the third party defendants and cross-plaintiffs (Roane, Inc., Roane individually, Godinez, and South Texas Cattle Management Corporation). Appellant also complains of the trial court action in allowing the plaintiff Guerra and the third party defendants and cross-plaintiffs (collectively) each one hour for jury argument. Appellant, as original defendant, third party plaintiff and cross-defendant, was also allowed six peremptory jury strikes and one hour for argument.

The case as between plaintiff Guerra and the defendant Gas Co., involved the issues of negligence of that defendant and the amount of plaintiffs' damages. The case as between Gas Company as third party plaintiff and Roane, Inc. and individually, Godinez and Cattle Company as third party defendants, involved Gas Company's claim that the third party defendants were negligent and for recovery of damages to its pipeline and for loss of gas, and for indemnity and contribution in event of a recovery by plaintiff; and additionally involved were the counterclaims of Roane, Inc., and Cattle Company against Gas Company for damages to the bulldozer and pickup truck. Plaintiff Guerra was not interested in the issues raised by Gas Co., as third party plaintiff against the third party defendants either as to liability or damages, or as to the issues of damage asserted by

Roane, Inc. and Cattle Company raised by their counterclaims against Gas Co. (although the negligence of the Gas Company was of joint interest to the plaintiff and the counter-claimants against the Gas Co.). Additionally, Roane (Inc. and individually) and Cattle Company urged a plea of unavoidable accident in their answer to the third party action of Gas Company, which conflicted directly with Guerra's asserted cause of action.

■■■ It is apparent that there was a diversity of interest here between plaintiff Guerra and the third party defendants and cross-plaintiffs, and their interests were at least in part antagonistic. The trial court correctly allowed six peremptory challenges each to the plaintiff and collectively to the third party defendants and cross-plaintiffs. See Rule 233, Texas Rules of Civil Procedure; Tamburello v. Welch, 392 S.W.2d 114 (Tex.Sup.1965); Cruse v. Daniels, 293 S.W.2d 616 (Tex.Civ.App., Amarillo 1956, wr. ref. n. r. e.). The amount of time for jury argument allowed by the trial court to the various parties was discretionary under the conditions existing here and no abuse of discretion is shown. Appellant's point 10 is overruled.

Appellant's points 11–21 complain of the jury findings on special issues 15, 17, 20, 22, 24, 26, 29, 32, 34, 36 and 38, all of which relate to the controversies between Gas Company, Roane, Inc. and Cattle Company. The findings on all of those special issues were favorable to Roane, Inc. and Cattle Company. The jury *refused to find* in response to such issues so numbered: (15) that Roane, Inc., in relying on Gas Company to discover it was excavating was negligent (Point 11); (17) that Roane, Inc., prior to beginning to excavate where the accident happened failed to make proper inspection of the above ground objects on the Arrowhead Ranch and nearby (Point 12); (29) that Cattle Company, prior to the accident failed to make proper inspection of the above ground objects and nearby (Point 13); (20) that Roane, Inc.'s failure to search the Deed Records to ascertain whether there was a right-of-way easement for a pipeline at or near the place the accident happened was negligence (Point 14); (32) that Cattle Company's failure to search the Deed Records to ascertain whether there was a right-of-way easement for a pipeline at or near the place the accident happened was negligence (Point 15); (22) that Roane, Inc. failed to properly examine maps and/or charts of the area prior to commencing excavating where the accident happened (Point 16); (34) that Cattle Company failed to properly examine maps and/or charts of the area prior to commencing excavating where the accident happened (Point 17); (26) that Roane, Inc. knew before the accident that there were pipelines on the Arrowhead Ranch, without knowing their exact route or path across it (Point 18); (38) that Cattle Company knew before the accident that there were pipelines on the Arrowhead Ranch, without knowing their exact route (Point 19); (24) that Roane, Inc., before commencing to excavate, failed to make proper inquiry of a pipeline company or pipeline companies (Point 20); (36) that Cattle Company, before commencing to excavate, failed to make proper inquiry of a pipeline company or pipeline companies (Point 21). We reiterate what was said prior to summarizing the special issues just mentioned, that the jury *refused to find* in favor of Gas Company as to the acts, omissions or negligence inquired about therein. Therefore there was no basis in such findings, or elsewhere in the verdict for rendition of a judgment in favor of Gas Company against either Roane, Inc., Roane, individually, or Cattle Company.

■■■ Appellant's points 11–21 each assert in substance that as to the eleven special issues mentioned the trial court erred in rendering judgment in favor of either Roane, Inc., or Cattle Company based in whole or in part on each of the jury answers thereto because (a) the acts, omissions or negligence mentioned (on the part of Roane, Inc. and Cattle Company) as well as their each being a proximate cause of the accident, were established as a matter of

**914**

law, and (b) the jury's answer was against the overwhelming weight and preponderance of the evidence. We do not agree with appellant's stated contentions. A review of all the evidence in this case leads to the conclusion that the questions of negligence and proximate cause were not conclusively established against Roane, Inc., or Cattle Company, and that the jury answers to the special issues mentioned are not against the overwhelming weight and preponderance of the evidence. Appellant's points 11–21 are overruled.

Appellant's point 22 asserts that the trial court erred in overruling appellant's motions for mistrial and new trial because of the alleged deliberate, studied injection by counsel for appellee Guerra of the subject of insurance during the examination of the witness E. S. Whitefield. Whitefield was called as a witness for appellant for the purpose of impeaching the testimony of Mr. Herbert Wied, whose testimony has heretofore been referred to. Whitefield testified that he was an investigator with Whitefield and Roquemore, Inc.; that he was employed to make an investigation concerning the accident in question at the request of counsel for appellant and under his supervision and direction; that he (Whitefield) talked to Mr. Wied about July 1, 1969 and asked him whether he could identify the pickup that the man was supposedly driving when he had a conversation with him on the Arrowhead Ranch and Wied said he could not identify the man or the truck; and that Whitefield had been asked by counsel for appellant to do a number of things while down there.

The complete cross-examination of Whitefield by counsel for appellee Guerra was as follows:

"Q Who paid you to do this?

A Mr. Lockett's firm and the company.

Q Is that who you sent your invoice to?

A No, sir.

Q Who did you send your invoice to?

A Adams Insurance Company."

Appellant and appellee Guerra both say that the last answer "Adams Insurance Company" is incorrectly shown as such by the Statement of Facts and that the answer actually given by the witness was "Highlands Insurance Company." We regard the difference as immaterial to disposition of the case.

Counsel for appellee timely moved for mistrial on the basis of the hereinabove set out cross-examination of Whitefield by counsel for appellee Guerra. Appellant's motion for mistrial was overruled, and the alleged erroneous ruling was carried forward into appellant's motion for new trial. We believe that appellant's contention that the subject of insurance was improperly injected into the case by the above-mentioned cross-examination of the witness Whitefield is answered by the opinion in Aguilera v. Reynolds Well Service, Inc., 234 S.W.2d 282 (Tex.Civ.App., San Antonio 1950, wr. ref. opinion per Norvell, J.). Under the rules stated in *Aguilera*, the cross-examination of Whitefield was proper for the purpose of revealing every relation tending to show interest, bias or motive on his part or affecting his credibility, even though such examination may have disclosed that the defendant in this personal injury action was protected by insurance. The question of Whitefield's employer was opened up by appellant and cross-examination directed to full development of the facts relating to the issue was proper. See Aguilera v. Reynolds Well Service, supra; Barton Plumbing Co. v. Johnson, 285 S.W. 2d 780 (Tex.Civ.App., Galveston 1955, wr. ref.); Walker v. Missouri Pacific Railroad Company, 425 S.W.2d 462 (Tex.Civ.App., Houston 14th 1968, wr. ref. n. r. e.). Appellant's point 22 is overruled.

Appellant's points 23, 24 and 25 complain of the amount of Guerra's damages found by the jury in answer to special issue 47 ($10,000.00 for past physical pain and mental suffering); special issue 48 ($13,500.00 for future physical pain and mental suffering); and special issue 50 ($34,000.00 for future loss of earning capacity). The

points mentioned assert in substance that the trial court erred in not setting aside respectively the findings mentioned and in rendering judgment against appellant based on each of them. As we read appellant's points and the argument thereunder the only contention made as to each of said findings is that of excessiveness.

The basic injuries sustained by appellee Guerra were compound fractures of both the tibia and fibula of the right lower leg. Expert medical testimony was given by Dr. Kenneth R. Reidland, an orthopedic specialist who treated Guerra. Hospital records in evidence cover four separate confinements of Guerra. His injuries apparently resulted from his right leg being struck or crushed by the post hole digger he was using or by a large clod of dirt at the time the pipeline ruptured. Guerra was in the hospital the first time for eight days. Dr. Reidland testified that with traction the fracture site was realigned and plaster applied. This was a long leg cast from the toes to the top of the thigh. When Guerra left the hosptial at the end of his first confinement and went home he was on crutches and also used a wheel chair. He did not bear any weight on the injured leg. Shortly thereafter, he began to have pain in his right hip and spit blood. Guerra was hospitalized the second time from October 23 to November 3, 1968. At that time he was coughing up blood, which the doctors felt was because of a pulmonary embolism, that is, a clot from inside a vein which had broken off near the fracture site, travelled through the vein, returning through the heart out to the pulmonary artery and to the lung. Guerra was hospitalized the third time on February 9, 1969, a little more than four months after the accident, for a sequestra of a bone spike or fragment at the fracture site. This was done under general anaesthetic. At that time Dr. Reidland decided that the union of the fracture was progressing slowly and that Guerra would have to be later hospitalized for a fusion. Guerra was hospitalized for the fourth time on April 12, 1969. At that time a bone graft was performed using bone taken from his hip and grafted into the fracture site of his leg. Guerra was discharged from this hospital confinement on April 20, 1969. At the time of trial herein, in October 1969, Guerra's leg was still in a cast, but it was a shorter one that had been substituted about September 3, 1969 for a longer one applied after the operation in April 1969. Dr. Reidland testified in substance that where fractures of the kind here involved were present that the healing process was more difficult because of interference with or interruption of the blood supply in the affected area. Dr. Reidland also testified that in his opinion Guerra would have from twenty-five to thirty percent permanent disability to his leg unless complications developed which could result in Guerra's not being able to perform work at all.

The testimony reflected that Guerra had an abnormal right foot due to a congenital condition which could be described as a flat foot that is painful or a foot that has characteristics which are commonly seen in people who have painful flat feet. Dr. Reidland testified that if a painful flat foot does not respond to proper shoes and proper mobilization and exercises, an operation known as a triple orthodesis might be performed, under which procedure three joints in the foot are fused together. Dr. Reidland also testified that assuming there would be no foot problem, that Guerra would need some physical therapy in the future and estimated future medical expenses including such therapy would amount to $150.00 to $200.00. The jury found in answer to special issue 51 that $2580.90 would reasonably compensate Guerra for reasonable and necessary medical expenses from October 1, 1968 to date of verdict on October 22, 1969, a period of slightly more than one year. Dr. Reidland also testified that it would be from several months to possibly a year before Guerra could go back to his same type of work.

Guerra's testimony in part reflected that he was 46 years of age and had always worked on a ranch; that his injuries caused pain and suffering to him, particularly in his right leg, chest and back; that at the

time of his injury he earned $114.50 every 15 days and additionally was furnished a house for his family to live in.

■ There is no formula for exact measurement of pecuniary compensation for past and future physical pain and mental suffering. The amount reasonably necessary to compensate an injured person for such elements of damage must largely be left to the discretion of the jury. See Greyhound Lines, Inc. v. Craig, 430 S.W.2d 573, 578, 579 (Tex.Civ.App., Houston 14th, 1968, wr. ref. n. r. e.); Missouri Pacific Railroad Co. v. Miller, 426 S.W.2d 569, 574 (Tex.Civ.App., San Antonio 1968, n. w. h.); Red Top Taxi Co. v. Snow, 452 S.W.2d 772, 779 (Tex.Civ.App., Corpus Christi 1970, n. w. h.). The awards for such elements of damage were particularly within the province of the jury in this case. The award for Guerra's future loss of earning capacity was within the range of testimony on the subject. We are unable to say that the amounts awarded by the jury were excessive and we are not authorized in such situation to substitute our judgment for that of the jury. Appellant's points 23, 24 and 25 are overruled.

■ Appellant's point 26 asserts that the trial court erred in not setting aside the jury finding on special issue 53 (that "none" was the amount of damages of Gas Company from the accident) because such answer was against the overwhelming weight of, and the undisputed, evidence; and that judgment should not have been rendered against appellant on the basis of such finding. The point in question involves the claim of appellant, as third party plaintiff, against the appellees (except David Guerra) who were third party defendants, particularly Roane, Roane, Inc., and Cattle Company. The jury findings herein failed to establish liability against the third party defendants. As is hereinbefore discussed, appellant's points complaining of the jury's refusal to find against the third party defendants on the issues of their negligence or proximate cause are not well taken. The contention of the appel-

lees, who were third party defendants, that the jury answer of "None" to special issue 53 was immaterial is, therefore, well taken. There was no basis for allowing recovery to appellant as third party plaintiff in the absence of liability being established in its favor, and the question of damages became immaterial to rendition of judgment. See Southern Pine Lumber Co. v. Andrade, 132 Tex. 372, 124 S.W.2d 334 (1939). Appellant's point 26 is overruled.

■ Appellant's point 27 asserts in substance that the trial court erred in not granting a new trial because the answer of the jury to special issue 9 (that the excavation of the stock tank was not an extraordinary use of the surface of the land) and special issues 47–53 inclusive (as to amount of damages) show that the jury did not base its verdict on evidence, but instead was actuated by improper influences, such as passion, prejudice and a desire to return a verdict favorable to plaintiff and cross plaintiffs, without regard to the merits of the case. The contentions made under appellant's point 27 have been partially discussed in our consideration of appellant's points 1, 2, 23, 24, 25 and 26. An additional review and reiteration of the evidence reflects the following: Mr. Lohmann, Manager of Cattle Company, testified that the stock tank in question was being excavated where an old one had previously existed; that five other tanks had been dug within ten to twelve days immediately theretofore; and that stock tanks are frequently adjacent to windmills in the area. Mr. Lloyd Bentsen, Sr., owner of the Arrowhead Ranch, testified that the digging of a water tank in the area is not an unusual use of the land; that it is done on all of the ranches; and that he has at least 25 stock tanks on his ranches. Appellant's contention that the jury's finding of "None" in answer to issue 53 (concerning damages of appellant) reflects improper influences, passion and prejudice and requires a new trial is largely answered by the opinion and holdings in Southern Pine Lumber Co. v. Andrade, supra. There it was held in substance that, while the action of a jury in answering a

damage issue directly contrary to the undisputed evidence may be cause for suspicion that the answer was induced by prejudice or improper influence, the court would not be justified in assuming that prejudice or improper influence was responsible for the jury's answers to other issues relating to negligence where there was substantial evidence in the record supporting those answers and no evidence that prejudice or improper influence entered into or caused them. See also, American Produce & Vegetable Co. v. Phoenix Assurance Company of New York, 408 S.W.2d 954 (Tex.Civ. App., Dallas, 1966, n. w. h.). With reference to the jury findings concerning Guerra's damages on issues 45–53, the record reflects that the aggregate amount was $64,530.90. The trial court reduced that amount to $60,470.90 in order that Guerra's recovery would be supported by his pleadings. The trial court properly denied appellant's motion for new trial on the basis of the contentions made. Appellant's point 27 is overruled.

 Appellant's points of error 28–32 assert as basis for a new trial that the trial court erred in overruling appellant's objections to special issues 4, 5, 6, 7, 8, 11, 41 and 43. Those issues have been heretofore mentioned in this opinion and briefly stated involve the following subjects: Issues 4 and 5, Gas Company's negligence and proximate cause as to replacement of the vent and sign near the road and scene of the accident. Issues 6, 7 and 8, Gas Company's failure to paint the fence where its pipeline crossed the road, negligence and proximate cause. Issue 11, Gas Company's failure to inform Cattle Company and Roane, Inc., of the existence of the pipeline in question. Issue 41, Gas Company's failure to properly inspect the pipeline. Issue 43, Gas Company's failure to install markers on the ranch to warn workers on the ranch of the location of the pipeline. Appellant's points 28–32, involving its objections to the special issues mentioned, are not well taken, primarily because the errors claimed have not been properly preserved for review. The

objections are contained in paragraphs 90, 91, 92, 93, 94, 97, 100, 102 and 105 of appellant's Amended Motion for New Trial. Each of said paragraphs is couched in the same general terms, of which paragraph 90 is typical, as follows:

"The court erred in overruling objection to Special Issue No. 4 contained in Paragraph 4 of this Defendant's and Third Party Plaintiff's Objection to Charge of the Court."

The other above-mentioned paragraphs of appellant's Motion for New Trial vary from paragraph 90 only concerning the number of the issue and paragraph of appellant's objection to the charge. There is not sufficient compliance here with Rules 321, 322 and 374, T.R.C.P. See Wagner v. Foster, 161 Tex. 333, 341 S.W.2d 887 (1960); Big Three Welding Equipment Company v. Roberts, 399 S.W.2d 912 (Tex. Civ.App., Corpus Christi 1966, wr. ref. n. r. e.); appellant's points 28–32 are overruled.

Appellant's point 33 asserts that the trial court erred in overruling appellant's objection to Special Issues 47 through 52 (concerning the separate elements of Guerra's damages). We have heretofore discussed under appellant's points 23, 24, and 25 the jury answers to Special Issues 47, 48 and 50. Under appellant's point 33, Special Issue 49 (Guerra's loss of earnings prior to trial, which was answered in the amount of $3,300.00), and Special Issue 51 (Guerra's medical expenses prior to trial, which was answered in the amount of $2,580.90), and Special Issue 52 (Guerra's medical expenses in the future, which was answered in the amount of $550.00) are also involved. Appellant's point 33 is without merit for the same reasons stated in connection with appellant's points 28–32, that is the contentions made thereunder have not been properly preserved for review in appellant's amended motion for New Trial. We perceive no error in submitting the elements of damage sought by Guerra in six separate special issues and hold that this is a per-

**918**

missible form of submission. See Texas Pattern Jury Charges and comment, PJC 11.04, pages 249–250; PJC 11.08 and 11.09, pages 256–257. Appellant's point 33 is overruled.

Appellant's point 34 asserts that, even though no one of the errors complained of presents reversible error, that the cumulative effect of the errors committed by the trial court require that a new trial be granted. After reviewing appellant's contentions in the light of the entire record and our holdings herein, we have concluded that, if errors were committed by the trial court, they were not individually or cumulatively calculated to cause nor did they probably cause the rendition of an improper judgment in this case. Rule 434, T.R.C.P.

The judgment of the trial court is affirmed.